UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

## 25-CR-80104-ROSENBERG/REINHART
Case No._____

18 U.S.C. § 1349
18 U.S.C. § 371
18 U.S.C. § 982(a)(7)

UNITED STATES OF AMERICA

vs.

JOHN R. ROBINSON JR.,

Defendant.

_____/

FILED BY_____BM_____D.C.

Jun 27, 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## INFORMATION

The United States Attorney charges that:

## GENERAL ALLEGATIONS

At all times material to this Information:

### Medicare Program

1.      The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

2.      Medicare was a "health care benefit program," as defined by 18 U.S.C. § 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

3.      Medicare covered different types of benefits and was separated into different program "parts." Medicare "Part A" covered health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies. Medicare "Part B" was a medical insurance program that covered, among other things, medical services provided by physicians, medical clinics, laboratories, and other qualified health care providers, such as office visits, minor surgical procedures, and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

4.      Physicians, clinics, laboratories, and other health care providers (collectively, "providers") that provided services to beneficiaries were able to apply for and obtain a "provider number." A provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

5.      A Medicare claim was required to contain certain important information, including: (a) the beneficiary's name and Health Insurance Claim Number ("HICN"); (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (e) the name of the referring physician or other health care provider, as well as a unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI").

6.      When submitting claims to Medicare for reimbursement, providers were required to certify that: (a) the contents of the forms were true, correct, and complete; (b) the forms were prepared in compliance with the laws and regulations governing Medicare; and (c) the items and services that were purportedly provided, as set forth in the claims, were medically necessary.

7.      Medicare would not reimburse providers for claims that were procured through the payment of kickbacks and bribes.

8.      CMS acted through fiscal agents called Medicare administrative contractors ("MACs"), which were statutory agents for CMS for Medicare Part B. The MACs were private entities that reviewed claims and made payments to providers for services rendered to beneficiaries. The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service.

9.      First Coast Service Options Inc. was the MAC for the consolidated Medicare jurisdictions that included the state of Florida.

## Genetic Testing

11.     Various forms of genetic testing existed using DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain diseases or health conditions in the future. For example, cardiovascular genetic testing (referred to herein as "cardio testing" or "cardio tests") used DNA sequencing to detect mutations in genes that could indicate an increased risk of developing serious cardiovascular conditions and could assist in the treatment or management of a patient who had signs or symptoms of a cardiovascular disease or condition. Primary immunodeficiency genetic testing used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain immunodeficiencies. Cardio testing and primary immunodeficiency genetic testing are referred to herein collectively as "genetic tests" or "genetic testing."

## Medicare Part B Coverage for Laboratory Tests

10.     Medicare did not cover laboratory testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed

body member." 42 U.S.C. § 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." 42 C.F.R. § 411.15(a)(1).

11.     If laboratory testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." 42 U.S.C. § 410.32(a).

## The Defendant, Related Entities, and Relevant Persons

12.     Keystone Logistics LLC ("Keystone") was a limited liability company formed under the laws of Florida with its principal place of business in Palm Beach County, Florida.

13.     JRR Marketing LLC ("JRR") was a limited liability company formed under the laws of Florida with its principal place of business in Palm Beach County, Florida.

14.     Zenith Dyad Inc. ("Zenith") was a corporation formed under the laws of Florida with its principal place of business in Palm Beach County, Florida.

15.     Cergena Laboratories LLC ("Cergena") was a limited liability company formed under the laws of Delaware with its principal place of business in Orleans Parish, Louisiana. Cergena was an independent laboratory that purportedly conducted genetic testing.

16.     Olympus First Consulting LLC ("Olympus") was a limited liability company formed under the laws of Florida with its principal place of business in Palm Beach County, Florida.

17.     Laboratory 1 was a limited liability company formed under the laws of Wyoming with its principal place of business in Palm Beach County, Florida. Laboratory 1 was an independent laboratory that purportedly conducted genetic testing.

18.     Laboratory 2 was a limited liability company formed under the laws of Florida with its principal place of business in Martin County, Florida. Laboratory 2 was an independent laboratory that purportedly conducted genetic testing.

19.     Defendant **JOHN R. ROBINSON JR.** was a resident of Palm Beach County, Florida, and an owner, operator, and manager of Keystone, JRR, and Zenith.

20.     Daniel M. Carver was an owner and operator of Cergena and Olympus.

21.     Co-Conspirator 1, a resident of Palm Beach County, Florida, was an owner and operator of Laboratory 1 and Laboratory 2.

## COUNT 1
### Conspiracy to Commit Health Care Fraud
### (18 U.S.C. § 1349)

1.     The General Allegations section of this Information is re-alleged and incorporated by reference as though fully set forth herein.

2.     From in or around November 2020, and continuing through in or around October 2023, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

**JOHN R. ROBINSON JR.,**

did willfully, that is, with the intent to further the object of the conspiracy, and knowingly combine, conspire, confederate, and agree with Daniel M. Carver, Co-Conspirator 1, and others known and unknown to the United States Attorney to commit an offense against the United States, that is, to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is Medicare,

and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

### Purpose of the Conspiracy

3.      It was a purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves by, among other things: (a) conducting deceptive telemarketing campaigns to convince beneficiaries to agree to take genetic tests, regardless of whether they needed the tests; (b) using deceptive means to obtain doctors' orders authorizing medically unnecessary genetic testing for these beneficiaries; (c) paying and receiving illegal kickbacks and bribes in exchange for the referral of beneficiaries and signed doctors' orders for genetic testing to laboratories; (d) submitting and causing the submission of false and fraudulent claims to Medicare for genetic tests that were medically unnecessary, ineligible for reimbursement, and procured through the payment of kickbacks and bribes; (e) concealing and causing the concealment of kickback payments; and (f) diverting kickback proceeds for their personal use and benefit, the use and benefit of others, and to further the conspiracy.

### Manner and Means

The manner and means by which the defendant and his co-conspirators sought to accomplish the object and purpose of the conspiracy included, among other things:

4.      **JOHN R. ROBINSON JR.**, Daniel M. Carver, Co-Conspirator 1, and other co-conspirators targeted Medicare beneficiaries with deceptive telemarketing campaigns to induce them to accept genetic tests regardless of medical necessity.

5.      **JOHN R. ROBINSON JR.** sent and caused to be sent misleading faxes to beneficiaries' doctors to convince them to sign orders for genetic tests that were medically unnecessary and ineligible for reimbursement, as the doctors did not meet with and examine the beneficiaries for the tests, were not treating the beneficiaries for the diseases or symptoms of the diseases underlying the tests, and did not use the test results to treat the beneficiaries.

6.      **JOHN R. ROBINSON JR.**, Daniel M. Carver, Co-Conspirator 1, and other co-conspirators, who were not medical professionals and who otherwise were not treating the Medicare beneficiaries, selected the diagnosis and procedure codes to be used for the tests in a manner designed to maximize Medicare reimbursements.

7.      **JOHN R. ROBINSON JR.**, through Keystone, JRR, and Zenith, solicited and received kickbacks and bribes from Daniel M. Carver, through Cergena and Olympus, and Co-Conspirator 1, through Laboratory 1 and Laboratory 2, in exchange for beneficiary referrals and signed doctors' orders authorizing genetic testing.

8.      **JOHN R. ROBINSON JR.**, Daniel M. Carver, and Co-Conspirator 1 concealed and disguised these kickbacks and bribes as payments for legitimate marketing services through entering into sham contracts and agreements.

9.      **JOHN R. ROBINSON JR.**, Daniel M. Carver, Co-Conspirator 1, and other co-conspirators, through Cergena, Laboratory 1, and Laboratory 2, billed and caused to be billed to Medicare genetic testing that was medically unnecessary, procured through kickbacks and bribes, and ineligible for reimbursement.

10.     **JOHN R. ROBINSON JR.**, Daniel M. Carver, and other co-conspirators caused Cergena to submit false and fraudulent claims to Medicare in at least the approximate amount of $9.5 million for genetic testing.

11. As a result of these false and fraudulent claims, Medicare made payments to Cergena in at least the approximate amount of $8 million.

12. **JOHN R. ROBINSON JR.**, Co-Conspirator 1, and other co-conspirators caused Laboratory 1 to submit false and fraudulent claims to Medicare in at least the approximate amount of $20 million for genetic testing.

13. As a result of these false and fraudulent claims, Medicare made payments to Laboratory 1 in at least the approximate amount of $15 million.

14. **JOHN R. ROBINSON JR.**, Co-Conspirator 1, and other co-conspirators caused Laboratory 2 to submit false and fraudulent claims to Medicare in at least the approximate amount of $32 million for genetic testing.

15. As a result of these false and fraudulent claims, Medicare made payments to Laboratory 2 in at least the approximate amount of $21 million.

16. **JOHN R. ROBINSON JR.**, through Keystone, Zenith, and JRR, received approximately $5.8 million from Daniel M. Carver and Co-Conspirator 1 as a result of the scheme.

17. **JOHN R. ROBINSON JR.**, Daniel M. Carver, Co-Conspirator 1, and other co-conspirators used the proceeds of the fraud to benefit themselves and others, and to further the fraud.

All in violation of Title 18, United States Code, Section 1349.

## COUNT 2
### Conspiracy to Solicit and Receive Health Care Kickbacks
### (18 U.S.C. § 371)

1. The General Allegations section of this Information is re-alleged and incorporated by reference as though fully set forth herein.

2.      From in or around November 2020, and continuing through in or around October 2023, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

**JOHN R. ROBINSON JR.,**

did willfully, that is, with the intent to further the object of the conspiracy, and knowingly combine, conspire, confederate, and agree with Daniel Carver, Co-Conspirator 1, and others known and unknown to the United States Attorney, to commit an offense against the United States, that is, to violate Title 42, United States Code, Section 1320a-7b(b)(1)(A), by knowingly and willfully soliciting and receiving any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare.

## Purpose of the Conspiracy

3.      It was a purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves by, among other things: (a) conducting deceptive telemarketing campaigns to convince beneficiaries to agree to take genetic tests, regardless of whether they needed the tests; (b) using deceptive means to obtain doctors' orders authorizing medically unnecessary genetic testing for these beneficiaries; (c) soliciting and receiving illegal kickbacks and bribes in exchange for the referral of beneficiaries and signed doctors' orders for genetic testing to laboratories; (d) submitting and causing the submission of false and fraudulent claims to Medicare for genetic tests that were medically unnecessary, ineligible for reimbursement, and procured through the payment of kickbacks and bribes; (e) concealing and causing the concealment of kickback payments; and (f) diverting kickback proceeds for their personal use and benefit, the use and benefit of others, and to further the conspiracy.

## Manner and Means

4.       The Manner and Means section of Count 1 of this Information is re-alleged and incorporated by reference as though fully set forth herein.

## Overt Acts

In furtherance of the conspiracy, and to accomplish its object and purpose, at least one co-conspirator committed and caused to be committed, in the Southern District of Florida, at least one of the following overt acts, among others:

5.       On or about November 2, 2020, **JOHN R. ROBINSON JR.**, through JRR, solicited and received a wire in the amount of approximately $500,000 from Daniel M. Carver, through Olympus, which was a kickback and bribe in exchange for recruiting and referring beneficiaries and doctors' orders for medically unnecessary genetic testing to Cergena.

6.       On or about September 1, 2021, **JOHN R. ROBINSON JR.**, through JRR, solicited and received a payment via check in the amount of approximately $1,180,000 from Co-Conspirator 1, through Laboratory 1, which was a kickback and bribe in exchange for recruiting and referring beneficiaries and doctors' orders for medically unnecessary genetic testing to Laboratory 1.

7.       On or about February 8, 2022, **JOHN R. ROBINSON JR.**, through JRR, solicited and received a payment via check in the amount of approximately $750,000 from Co-Conspirator 1, through Laboratory 1, which was a kickback and bribe in exchange for recruiting and referring beneficiaries and doctors' orders for medically unnecessary genetic testing to Laboratory 1.

8.       On or about October 3, 2023, **JOHN R. ROBINSON JR.**, through Zenith, solicited and received a payment via check in the amount of approximately $425,000 from Co-Conspirator

1, through Laboratory 2, which was a kickback and bribe in exchange for recruiting and referring beneficiaries and doctors' orders for medically unnecessary genetic testing to Laboratory 2.

All in violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATIONS

1.      The allegations of this Information are re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of certain property in which the defendant, **JOHN R. ROBINSON JR.**, has an interest.

2.      Upon conviction of a violation of Title 18, United States Code, Sections 1349 and 371, as alleged in this Information, the defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, pursuant to Title 18, United States Code, Section 982(a)(7).

3.      If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

      a.   cannot be located upon the exercise of due diligence;

      b.   has been transferred or sold to, or deposited with, a third party;

      c.   has been placed beyond the jurisdiction of the court;

      d.   has been substantially diminished in value; or

      e.   has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p).

All pursuant to Title 18, United States Code, Section 982(a)(7), and the procedures set forth in Title 21, United States Code, Section 853, as incorporated by Title 18, United States Code, Section 982(b)(1).

HAYDEN P. O'BYRNE
UNITED STATES ATTORNEY

LORINDA I. LARYEA, ACTING CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

REGINALD CUYLER JR.
AISHA SCHAFER HYLTON
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**UNITED STATES OF AMERICA**

**CASE NO.:** __25-CR-80104-ROSENBERG/REINHART__

v.

JOHN R. ROBINSON, JR.,

_____/
Defendant.

**CERTIFICATE OF TRIAL ATTORNEY**

**Superseding Case Information:**
New Defendant(s) (Yes or No) _____
Number of New Defendants _____
Total number of new counts _____

**Court Division** (select one)
☐ Miami   ☐ Key West   ☐ FTP
☐ FTL   ☑ WPB

I do hereby certify that:

1. I have carefully considered the allegations of the Indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.
2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, 28 U.S.C. §3161.

3. Interpreter: (Yes or No) No___
   List language and/or dialect: _____

4. This case will take __0__ days for the parties to try.
5. Please check appropriate category and type of offense listed below:

   (Check only one)
   I   ☑  0 to 5 days
   II  ☐  6 to 10 days
   III ☐  11 to 20 days
   IV  ☐  21 to 60 days
   V   ☐  61 days and over

   (Check only one)
   ☐ Petty
   ☐ Minor
   ☐ Misdemeanor
   ☑ Felony

6. Has this case been previously filed in this District Court? (Yes or No) No___
   If yes, Judge _____ Case No. _____
7. Has a complaint been filed in this matter? (Yes or No) No___
   If yes, Judge _____ Magistrate Case No. _____
8. Does this case relate to a previously filed matter in this District Court? (Yes or No) Yes___
   If yes, Judge David S. Leibowitz___ Case No. 22-CR-80022_____
9. Defendant(s) in federal custody as of _____
10. Defendant(s) in state custody as of _____
11. Rule 20 from the _____ District of _____
12. Is this a potential death penalty case? (Yes or No) No___
13. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared M. Strauss)? (Yes or No) No___
14. Did this matter involve the participation of or consultation with Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? No___
15. Did this matter involve the participation of or consultation with Magistrate Judge Marty Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024? No___
16. Did this matter involve the participation of or consultation with Magistrate Judge Ellen F. D'Angelo during her tenure at the U.S. Attorney's Office, which concluded on October 7, 2024? No___

By: _____ for:_____
REGINALD CUYLER, JR.
DOJ Trial Attorney
FL Bar No.          0114062

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

Defendant's Name:  JOHN R. ROBINSON, JR.

Case No: _____

Count #:  1

Title 18, United States Code, Section 1349

Conspiracy to Commit Health Care Fraud
* Max. Term of Imprisonment:    10 years
* Mandatory Min. Term of Imprisonment (if applicable):   N/A
* Max. Supervised Release:   3 years
* Max. Fine:   $250,000 or twice the gross gain or loss from the offense

Count #:  2

Title 18, United States Code, Section 371

Conspiracy to Pay and Receive Health Care Kickbacks
* Max. Term of Imprisonment:    5 years
* Mandatory Min. Term of Imprisonment (if applicable):    N/A
* Max. Supervised Release:    3 years
* Max. Fine:    $250,000 or twice the gross gain or loss from the offense

*Refers only to possible term of incarceration, supervised release and fines.   It does not include
restitution, special assessments, parole terms, or forfeitures that may be applicable.

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

United States of America )
v. )
)
John R. Robinson, Jr., )
*Defendant* )

Case No. **25-CR-80104-ROSENBERG/REINHART**

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

_____
*Printed name of defendant's attorney*

_____
*Judge's signature*

_____
*Judge's printed name and title*